NATIONAL WILDLIFE FEDERATION v DEPARTMENT OF
ENVIRONMENTAL QUALITY (No 1)

Docket No. 307602. Submitted June 3, 2014, at Lansing. Decided August 12,
    2014, at 9:00 a.m. Leave to appeal sought.

Kennecott Eagle Minerals Company sought to develop an under-
ground mine to extract nickel and copper from the sulfide ores
beneath the headwaters of the Salmon Trout River in the Yellow
Dog Plains in Marquette County. Kennecott submitted applica-
tions to the Department of Environmental Quality (DEQ) for a
nonferrous metallic mineral mining permit and a groundwater
discharge permit. The DEQ consolidated the applications for
public hearings and eventually issued the mining and discharge
permits to Kennecott. Petitioners, the National Wildlife Federa-
tion, Yellow Dog Watershed Preserve, Inc., Keweenaw Bay Indian
Community, and Huron Mountain Club, requested contested case
hearings on both permits. An administrative law judge (ALJ)
issued a proposal for decision, rejecting all challenges but crediting
the concern of the Keweenaw Bay Indian Community that Eagle
Rock, the proposed location for the mine's portal, was a place of
worship and concluding that the permit application should there-
fore include a specific assessment in that regard. The DEQ initially
remanded the matter to the ALJ for additional findings on
whether Eagle Rock was a place of worship, then vacated that
order and referred that issue along with the rest of the issues in
the case to the DEQ's final decision-maker for a final determina-
tion and order. The final determination and order adopted the
findings of fact and conclusions of law set forth in the ALJ's
proposal for decision, with minor additions, except the final
decision-maker concluded that a stipulation prevented petitioners
from making the religious status of Eagle Rock an issue or,
alternatively, that Mich Admin Code, R 425.202(2)(p), which calls
for the assessment of mining impacts on "places of worship,"
concerned only buildings used for human occupancy, not purely
outdoor locations such as Eagle Rock. Petitioners sought judicial
review in the Ingham Circuit Court. The circuit court, Paula J.
Manderfield, J., entered separate orders affirming the decisions of
the DEQ to grant both permits. Petitioners filed separate applica-
tions for leave to appeal with regard to both permits. The Court of

Appeals granted both applications in unpublished orders. The present case, Docket No. 307602, concerns the decision to grant the mining permit. The companion case, Docket No. 308366, concerns the decision to grant the groundwater discharge permit and is reported following the present case.

The Court of Appeals *held*:

1. The DEQ and the circuit court correctly recognized the contested case proceeding below as an extension of the initial application process.

2. The DEQ did not err by allocating to appellants the burden of proof to prove their objections in the contested case proceedings. Mich Admin Code, R 324.64(1) imposes on a party filing a petition for a contested case hearing the burden of proof and of moving forward unless otherwise required by law. The provisions of MCL 324.63205(3), which establish that a person or entity seeking a mining permit under Part 632 of the Natural Resources and Environmental Protection Act, MCL 324.63201 to MCL 324.63223, bears the burden of proving that the mining project will satisfy applicable requirements, do not set forth other law governing contested case proceedings under Part 632.

3. The testimony does not support appellants' contention that the DEQ failed to hold Kennecott to its initial burden of proof concerning mitigating environmental damage or otherwise complying with applicable law.

4. The circuit court did not misapprehend or misapply the pertinent standard of review by holding that substantial evidence supported the DEQ's conclusion that the mine would be structurally sound.

5. Substantial evidence supported the conclusion that the proposed mining project imposed no significant potential for environmental impacts beyond the mining site. There was more than a scintilla of the evidence supporting the conclusion that there was no significant potential for environmental impacts beyond the immediate mining area.

6. Because Kennecott neither knew, nor should have known, of the alleged traditional cultural uses of Eagle Rock when it offered its environmental impact assessment under MCL 324.63205(2)(b), the assessment was not deficient for want of consideration of Eagle Rock.

7. The circuit court correctly recognized that the expert testimony concerning the lack of protocols for analyzing the cumulative impacts from all proposed mining activities and through all processes or mechanisms and that indicated that Kennecott had

followed best practices constituted substantial evidence to support the DEQ's determination that Kennecott had satisfied the requirement of Mich Admin Code, R 425.202(1)(b) and (2) to consider cumulative impacts.

8. The record contains more than a scintilla of the evidence indicating that the mining plans include adequate safeguards to protect surface waters from acid rock drainage.

9. Because substantial evidence supported the conclusion that the crown pillar of the mine would be stable, the DEQ and the circuit court did not err by not requiring Kennecott's contingency plans to consider an extreme-case scenario regarding failure of the crown pillar.

Affirmed.

ADMINISTRATIVE LAW — BURDEN OF PROOF — CONTESTED CASE PROCEEDINGS.

MCL 324.63205(3) establishes that a person or entity seeking a mining permit under Part 632 of the Natural Resources and Environmental Protection Act, MCL 324.63201 to MCL 324.63223, bears the burden of proving that the mining project will satisfy the requirements applicable to the project; Subsection 63205(3) does not set forth "other law" governing contested case proceedings under Part 632 for purposes of Mich Admin Code, R 324.64(1), which imposes on a party filing a petition for a contested case hearing the burden of proof and of moving forward "unless otherwise required by law."

*Hooper, Hathaway, Price, Beuche & Wallace* (by *Bruce T. Wallace, William J. Stapleton*, and *Angela L. Jackson*) for the National Wildlife Federation, Yellow Dog Watershed Preserve, Inc., Keweenaw Bay Indian Community, and Huron Mountain Club.

*F. Michelle Halley* for the National Wildlife Federation and Yellow Dog Watershed Preserve, Inc.

*Honigman, Miller, Schwartz and Cohn LLP* (by *Eric J. Eggan* and *H. Kirk Meadows*) and *Heather L. Chapman* for the Keweenaw Bay Indian Community.

*Bill Schuette*, Attorney General, *Aaron D. Lindstrom*, Solicitor General, *Richard A. Bandstra*, Chief Legal

Counsel, and *Robert P. Reichel* and *Andrew T. Prins*, Assistant Attorneys General, for the Department of Environmental Quality.

*Warner Norcross & Judd LLP* (by *Daniel P. Ettinger* and *Gaëtan Gerville-Réache*) for Kennecott Eagle Minerals Company.

Before: CAVANAGH, P.J., and OWENS and STEPHENS, JJ.

PER CURIAM. Appellants appeal by leave granted the circuit court's order affirming the decision of the Department of Environmental Quality (DEQ) to grant a mining permit to the Kennecott Eagle Minerals Company. We affirm.

## I. FACTS

This case reflects the attempt to balance the potentially conflicting imperatives of exploiting a great economic opportunity and protecting the environment, natural resources, and public health. At issue is appellee Kennecott's proposal to develop an underground mine to extract nickel and copper from the sulfide ores beneath the headwaters of the Salmon Trout River in the Yellow Dog Plains in Marquette County.

Governing such activities is 2004 PA 449, which added Part 632, MCL 324.63201 to MCL 324.63223, to the Natural Resources and Environmental Protection Act, MCL 324.101 *et seq.* MCL 324.63205(1) states: "A person shall not engage in the mining of nonferrous metallic minerals except as authorized in a mining permit issued by the department." A "nonferrous metallic mineral" is "any ore or material to be excavated from the natural deposits on or in the earth for its metallic content, but not primarily for its iron or iron

mineral content, to be used for commercial or industrial purposes." MCL 324.63201(j). The Legislature set forth certain findings on this subject in MCL 324.63202, including the following:

> (c) Nonferrous metallic sulfide deposits are different from the iron oxide ore deposits currently being mined in Michigan in that the sulfide minerals may react, when exposed to air and water, to form acid rock drainage. If the mineral products and waste materials associated with nonferrous metallic sulfide mining operations are not properly managed and controlled, they can cause significant damage to the environment, impact human health, and degrade the quality of life of the impacted community.

> (d) The special concerns surrounding nonferrous metallic mineral mining warrant additional regulatory measures beyond those applied to the current iron mining operations.

> (e) Nonferrous metallic mineral mining may be an important contributor to Michigan's economic vitality. The economic benefits of nonferrous metallic mineral mining shall occur only under conditions that assure that the environment, natural resources, and public health and welfare are adequately protected.

In February 2006, Kennecott submitted applications to the DEQ for a nonferrous metallic mineral mining permit and a groundwater discharge permit. In January 2007, the DEQ consolidated the applications for public hearings, which were held in September 2007. In December 2007, the DEQ issued the mining and discharge permits to Kennecott.

Appellants requested contested case hearings on both permits. The DEQ's administrative law judge (ALJ) held consolidated hearings over the spring and summer of 2008. In August 2009, the ALJ issued a proposal for decision, rejecting all challenges but crediting the concern of appellant Keweenaw Bay Indian

Community that the proposed location for the mine's portal, Eagle Rock, was a place of worship, and concluding that the permit application should therefore include a specific assessment in that regard.

The DEQ initially remanded the matter to the ALJ for additional findings on whether Eagle Rock was a place of worship, then vacated that order and referred that issue along with the rest of the case to its final decision-maker for a final determination and order.

The final decision-maker concluded that a stipulation prevented appellants from making the religious status of Eagle Rock an issue, and, alternatively, that Mich Admin Code, R 425.202(2)(p), which calls for assessment of mining impacts on "places of worship," concerned only buildings used for human occupancy, not purely outdoor locations such as Eagle Rock. The final determination and order thus departed from the ALJ's recommendations in that regard, but otherwise adopted the findings of fact and conclusions of law set forth in the proposal for decision, with minor additions, and granted the mining permit.

Appellants sought judicial review in the circuit court, which, in a lengthy and detailed opinion and order, affirmed the DEQ in all regards. This Court granted leave to appeal in an unpublished order entered August 7, 2012.[1]

## II. STANDARDS OF REVIEW

The circuit court's task was to review the administrative decision to determine if it was authorized by law and supported by competent, material, and substantial evi-

---

[1] As noted, this appeal relates only to the decision to grant the mining permit. The decision to grant the groundwater discharge permit is the subject of this case's companion, *Nat'l Wildlife Federation v Dep't of Environmental Quality (No 2)*, 306 Mich App 369; 856 NW2d 394 (2014) (Docket No. 308366).

dence on the whole record. Const 1963, art 6, § 28; MCL 24.306(1). An agency decision is not authorized by law if it violates constitutional or statutory provisions, lies beyond the agency's jurisdiction, follows from unlawful procedures resulting in material prejudice, or is arbitrary and capricious. *Northwestern Nat'l Cas Co v Comm'r of Ins*, 231 Mich App 483, 488; 586 NW2d 563 (1998).

"[W]hen reviewing a lower court's review of agency action this Court must determine whether the lower court applied correct legal principles and whether it misapprehended or grossly misapplied the substantial evidence test to the agency's factual findings." *Boyd v Civil Serv Comm*, 220 Mich App 226, 234; 559 NW2d 342 (1996). "This latter standard is indistinguishable from the clearly erroneous standard . . . . [A] finding is clearly erroneous when, on review of the whole record, this Court is left with the definite and firm conviction that a mistake has been made." *Id.* at 234-235.

A tribunal's interpretation of a statute is subject to review de novo. *In re Complaint of Rovas*, 482 Mich 90, 102; 754 NW2d 259 (2008). A tribunal's interpretation of an administrative rule is reviewed likewise. *Aaronson v Lindsay & Hauer Int'l Ltd*, 235 Mich App 259, 270; 597 NW2d 227 (1999). A tribunal's evidentiary decisions are reviewed for an abuse of discretion. See *Price v Long Realty, Inc*, 199 Mich App 461, 466; 502 NW2d 337 (1993).

Unpreserved issues, however, are reviewed for plain error affecting substantial rights. *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000).

### III. SCOPE OF CONTESTED CASE PROCEEDINGS

Appellants argue that the ALJ erred by allowing the introduction of new evidence in the contested case proceedings, or otherwise in treating the contested case

as an extension of the original process of deciding the permit application. Appellants suggest that the original application proceedings leading up to the initial decision to issue the mining permit should be deemed a completed adjudication, with the contested case proceedings that followed then serving as the first stage of appellate review, which, for that reason, should have proceeded with a conservative approach to taking new evidence. We disagree.

As noted in our opinion affirming the circuit court's rejection of this argument in connection with appellants' objections to the DEQ's decision to issue a groundwater discharge permit, *Nat'l Wildlife Federation v Dep't of Environmental Quality (No. 2)*, 306 Mich App 369; 856 NW2d 394 (2014) (Docket No. 308366), § 1701(1) of the Natural Resources and Environmental Protection Act, MCL 324.1701(1), authorizes the circuit court to grant "declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction." Section 1704(2) adds that, when "administrative, licensing, or other proceedings are required or available to determine the legality of the defendant's conduct, the court may direct the parties to seek relief in such proceedings." Section 1704(4) states: "If judicial review of an administrative, licensing, or other proceeding is available, . . . the court originally taking jurisdiction shall maintain jurisdiction for purposes of judicial review."

MCL 324.63205(2) through MCL 324.63205(15) set forth procedures for applying for a mining permit and for an initial agency decision on the application. MCL 324.63219(1) in turn authorizes a person aggrieved by agency action or inaction relating to a mining permit to

file a petition for a contested case hearing. The statutes governing discharge permits set forth parallel provisions. See MCL 324.3103(1); MCL 324.3106; MCL 324.3112(1) and (3).

As noted in the companion case, these statutory provisions collectively set forth avenues for the DEQ to arrive at a single final decision on a permit application. We decline to repeat here the full analysis from the companion case, but reiterate that MCL 324.1704 reserves appellate review to the circuit court that deferred to an administrative agency in the first instance and that the provisions for third parties to initiate contested cases, and generous provisions for submission of new evidence, better comport with original actions than with appellate proceedings. See also MCR 7.210(A) and MCR 7.216(A)(4) (restricting additions to the original record in appeals before this Court); MCL 24.275 and Mich Admin Code, R 324.64 (liberally providing for the presentation of evidence in contested cases).

For these reasons, we conclude that the DEQ and the circuit court correctly recognized the contested case proceeding below as an extension of the initial application process for purposes of arriving at a single final agency decision on the application for a mining permit.

### IV. BURDEN OF PROOF

Appellants argue that the DEQ erred by allocating the burden of proof to appellants to prove their objections in the contested case proceedings. We disagree.

MCL 324.63205(3) establishes that a person or entity seeking a mining permit under Part 632 bears the burden of proving that the mining project will satisfy applicable requirements, including that the project will proceed in ways minimizing adverse impacts on the environment:

> The applicant has the burden of establishing that the terms and conditions set forth in the permit application; mining, reclamation, and environmental protection plan; and environmental impact assessment will result in a mining operation that reasonably minimizes actual or potential adverse impacts on air, water, or other natural resources and meets the requirements of this act.

MCL 324.63219(1) authorizes a person aggrieved by agency action or inaction relating to a mining permit to file a petition for a contested case hearing, and § 63219(2) directs that such contested case hearings be held in accordance with the Administrative Procedures Act.[2] The latter authorizes administrative agencies to promulgate rules governing procedures for contested cases. MCL 24.233(3). Mich Admin Code, R 324.64(1), in turn, imposes on a party "filing an administrative complaint or petition for a contested case hearing . . . the burden of proof and of moving forward unless otherwise required by law."

Appellants insist that the burden of proof set forth in MCL 324.63205(3) properly remained with Kennecott beyond the initial application proceedings and through its answering of appellants' objections in the contested case proceedings. Appellants acknowledge Rule 324.64(1), but emphasize that it subordinates its allocation of the burden of proof where a different allocation is "required by law," and argue that such deference to "other law" should have kept MCL 324.63205(3) applicable throughout the proceedings below.

But MCL 324.63205(3) does not set forth "other law" governing contested case proceedings under Part 632, because it sets forth the burden of proof for an "applicant," meaning a party seeking a mining permit. Appellants assert that Kennecott remained an "applicant"

---

[2] MCL 24.201 *et seq.*

through all the proceedings below, which is true in an important sense, given that, as discussed in Part III of this opinion, the contested case proceeding properly decided the question of Kennecott's mining permit de novo, and so Kennecott always bore the burden of offering evidence with which the DEQ could decide if the requirements for a mining permit were satisfied.[3] But if, in that sense, Kennecott retained the status of applicant throughout the proceedings, it nonetheless took on the status of responding intervenor in answering appellants' objections. MCL 324.63205(3) governs applicants, not intervenors or respondents, and so does not constitute "other law" supplanting the allocation of the burden of proof in Rule 324.64(1) to those resorting to contested cases in hopes of vindicating objections to agency action or inaction.

Appellants also suggest that the DEQ failed to apply the proper statutory evidentiary standard in reviewing Kennecott's permit application in the first instance, asserting that the DEQ official who headed the review team in this matter testified that his team did not apply MCL 324.63205 in reviewing the permit application, and that the ALJ called on appellants to submit conclusive evidence that the mining operation would, in fact, pollute, impair, or destroy natural resources.

However, checking the page of the record appellants cited to support their assertion concerning how the ALJ approached the case brought to light only one of the many instances where the ALJ held appellants to the burden of proving their objections, consistent with the substantive commands of Rule 324.64(1). The discus-

---

[3] The DEQ's final determination and order reflected this understanding in pointing out that the case was ultimately decided on the basis of how the evidence preponderated generally, not simply on the basis of appellants' failure to prove their objections.

sion at the page cited related to the contested case proceeding, and thus sheds no light on what burden Kennecott was held to in initially satisfying the DEQ that it was entitled to the mining permit.

Appellants draw their argument about how the DEQ's team leader testified from the following exchange that occurred when that witness was cross-examined:

*Q.* Subsection (11)[4] lays out the terms under which your department could grant a permit; right?

*A.* Correct.

*Q.* And could you just read that language for the record? . . . Subsection (b) would be okay, I think.

*A.* Okay.

"Subject to subsection (10), the department shall approve a mining permit if it determines both of the following: The permit application meets the requirements of this part. The proposed mining operation will not pollute, impair or destroy the air, water or other natural resources or the public trust in those resources in accordance with Part 17 of this act.[5] In making this determination, the department shall take into account the extent to which other permit determinations afford protection to natural resources. For the purposes of this subsection, excavation and removal of nonferrous metallic minerals and of associated overburden and waste rock in and of itself does not constitute pollution, impairment or destruction of those natural resources."

*Q.* Now, subsection (12) indicates that, if the conditions in subsection (11), which you just read, are not met, the department shall deny the permit; right?

---

[4] MCL 324.63205(11).

[5] "This act" refers to the Natural Resources and Environmental Protection Act, MCL 324.101 *et seq.*, Part 17 of which, MCL 324.1701 to MCL 324.1706, is the Michigan environmental protection act, commonly referred to as the MEPA.

*A.* That is correct.

*Q.* Now, given the section we just read before this about the burden of proof being on the applicant, would you agree with me that the burden of proof is on the applicant to prove that they will not pollute, impair or destroy the air, water or other natural resources of the public trust and those resources in accordance with Part 17, which is the Michigan Environmental Protection Act, for the record?

*A.* The applicant does have the burden under this section, yes.

*Q.* Okay. The burden that they will not pollute; right?

*A.* . . . I'm not familiar with Part 17 . . . . I'm not sure of the contents of that.

*Q.* Okay. But they have the burden of proving that they will not pollute natural resources; right?

*A.* . . . [I]t says that subsection (10)—"The department shall approve a mining permit if it determines both of the following." But you're right. They have to provide us the information that we would be able to use to make that determination.

*Q.* So the applicant has the burden of proving that they will not pollute air, water or other natural resources; right?

*A.* Well, I don't understand that. I'm not sure what your question—

*Q.* I'm just asking do you agree with me about that— that that's what the language here says?

*A.* It does not say that, because it doesn't say anything about the applicant having the burden of proof there.

*Q.* But we just read that.

*A.* We read that in the previous section.

*Q.* Right. But we could go back and look at it if you want to. . . . I'll just read.

"The applicant has the burden of establishing that the terms and conditions set forth in the permit application, mining, reclamation and environmental protection plan and environmental assessment will result in a mining

operation that reasonably minimizes actual or potential adverse impacts on air, water and other natural resources and meets the requirements of this act."[6]

Right?

*A.* Correct.

*Q.* So all of these requirements—for the whole Part 632 and its rules, the applicant has the burden; right?

*A.* I'm not sure.

Counsel for Kennecott then objected that this question had been asked and answered. The ALJ opined that "he's done the best he can in answering it," but counsel for the National Wildlife Federation and the Yellow Dog Watershed Preserve, Inc., continued:

*Q.* [W]hat standard did you apply in guiding your team's review of the application and ultimately making a recommendation that the application be approved and a permit be granted? What was the standard you used?

*A.* We referred to the rule package and under the rules identified the sections that were required to be submitted by the applicant and did those indeed meet the requirements of the rules. And there's many rules that are there.

*Q.* There are. Did you apply this section of the statute to your analysis?

*A.* I did not, no.

*Q.* Did the mining team apply this section of the statute to its analysis?

*A.* I don't believe so, no.

Although counsel did finally succeed in obtaining the witness's agreement that his review team did not apply the statutory standard, presumably still referring to MCL 324.63205(3) and its placing of the burden on the applicant to show that a mining project will reasonably

---

[6] This is a close paraphrase of MCL 324.63205(3).

minimize adverse impacts on natural resources and otherwise comply with environmental laws, the witness stated earlier that the applicant bore the burden of showing such compliance. That witness's inability to engage in a discourse on the environmental protection act, as incorporated by reference within Part 632, shows only that the review team considered the myriad factors involved in deciding a permit application as being guided by a "package" of "many rules" instead of by general statutory provisions. The cross-examination set forth above did not include detailing or exploring those "many rules," let alone attempting to expose them as failing to operate in furtherance of the applicable statutory imperatives.

For these reasons, we conclude that the testimony that appellants here take issue with did not imply that the DEQ failed to hold Kennecott to its initial burden of proof concerning mitigating environmental damage or otherwise complying with applicable law.

### V. HYDRAULIC AND STRUCTURAL STABILITY

Appellants argue that the overwhelming weight of the evidence established that the mine is at substantial risk of hydraulic or structural failure if constructed and operated as planned. Appellants express concerns that the crown pillar—the undisturbed rock mass that is left between the active mine workings and the surface, in other words the "roof" of the mine—may collapse and that water from the overhead Salmon Trout River or wetlands could flood the mine and cause acid rock drainage on a large scale. The circuit court was satisfied that substantial evidence supported the DEQ's conclusion that the mine would be structurally sound. We agree with the circuit court.

Appellants point out that the DEQ's review team for this project resorted to outside experts to supplement its expertise in rock mechanics and geochemistry to review the plans and assert that the experts so relied on adjudged the mine application as proposing a " 'sloppy' and 'indefensible' "design. However, review of the complete opinions offered by those experts reveals that both were persuaded that the plans for the mine, as finally determined, would result in a structurally stable operation.

One of those experts, who was recognized without objection as an expert in the fields of mining engineering, geotechnical engineering, rock mechanics, and mine stability, recounted that he became involved in the instant project in 2007 and that initial concerns had included the stability of the crown pillar. But asked about a recommendation that mining operations be conducted initially to ensure a minimum thickness of $87\frac{1}{2}$ meters for the crown pillar, with careful monitoring thereafter, the expert opined that this "was a technically sound recommendation" and agreed that the mining permit should be approved. The other of those experts, whose credentials included having written a Ph.D. thesis on the analysis of crown-pillar stability, testified that the earlier envisioned crown pillar of $57\frac{1}{2}$ meters would be "marginally stable," but that one of 87 meters as eventually decided on "is definitely going to be stable."

Appellants repeatedly assert that the latter witness contradicted himself in a communication offered the same day, and they separately contest an evidentiary decision that kept that contradiction out of the record. Appellants advise that this expert communicated through an e-mail to an official with Kennecott's parent company that he retained serious concerns with even an

87¹/₂-meter crown pillar. However, the copy of this e-mail appellants wanted to enter into evidence was but one part of an offered deposition exhibit of over a thousand pages. Although the subject of that e-mail was touched upon during that expert's deposition, there was no hint that that one part of the voluminous exhibit seemed to contradict his approval of the crown pillar as ultimately proposed. Further, that witness was available for neither cross-examination nor rehabilitation when appellants attempted to contest that potential impeachment evidence. For those reasons, the ALJ limited admission of that exhibit to documents actually discussed during the deposition. The circuit court affirmed that decision. We agree that, because appellants wished to resort to that impeachment evidence only after the opportunity to cross-examine the witness regarding it had passed, the ALJ's decision to disallow it was not an abuse of discretion.

Appellants otherwise point to expert testimony that persisted in expressing concerns about the stability of the mine and argue that it should have held sway. But, again, the circuit court's task was not to reevaluate the evidence, but rather to determine if substantial evidence supported the DEQ's decisions. " 'Substantial evidence' is evidence which a reasoning mind would accept as sufficient to support a conclusion. While it consists of more than a scintilla of evidence, it may be substantially less than a preponderance." *Tomczik v State Tenure Comm*, 175 Mich App 495, 499; 438 NW2d 642 (1989). Because the circuit court recognized that the opinions of the two experts discussed above approving of the crown pillar design as finally determined provided substantial evidence in support of the DEQ's conclusion that agreed with them, we conclude that the circuit court did not misapprehend or misapply the pertinent standard of review.

## VI. ENVIRONMENTAL IMPACT ASSESSMENT

MCL 324.63205(2)(b) requires that an application for a permit to engage in the mining of nonferrous metallic minerals include an environmental impact assessment (EIA) describing "the natural and humanmade features . . . in the proposed mining area and the affected area that may be impacted by the mining, and the potential impacts on those features from the proposed mining operation," and further directs that the EIA "define the affected area and . . . address feasible and prudent alternatives."

### A. POTENTIALLY AFFECTED AREA

Appellants argue that Kennecott's EIA failed to consider potential impacts outside the immediate mining area. We agree with the DEQ and the circuit court that Kennecott satisfied the pertinent requirement by showing that there would be no such impacts.

"Affected area" is defined as "an area outside of the mining area where the land surface, surface water, groundwater, or air resources are determined through an environmental impact assessment to be potentially affected by mining operations within the proposed mining area." MCL 324.63201(b). In this case, Kennecott's EIA addressed environmental impacts of the mining project within the mining site only, insisting that there was no significant potential for impacts beyond the site and thus that its study needed to go no further. Appellants argue that Kennecott's EIA thus failed to satisfy the requirement to take into account the whole area that mining operations might impact, including "area outside of the mining area."

We note that the statutory command to consider impacts "outside of the mining area" where natural

resources "are determined through an environmental impact assessment to be potentially affected by mining operations" on its face imposes the duty to consider area outside the immediate mining area only to the extent that "the land surface, surface water, groundwater, or air resources" of such area are determined to be vulnerable to the impacts of mining. The question, then, is whether there was substantial evidence to support the conclusion that the proposed mining project imposed no significant potential for such environmental impacts beyond its fences.

Not in dispute is that the experts offered conflicting opinions in these regards. The ALJ resolved them in favor of Kennecott, concluding that the record showed that there would be no adverse environmental effects outside the mine's fence line from air deposition, water drawdown, habitat fragmentation, or noise, that Kennecott's air emissions would meet air quality standards both on and off site, and that emissions would be at permissible levels and have no adverse impact on the area's flora or fauna. The ALJ was thus satisfied that Kennecott fulfilled the requirements of Part 632 to address the "affected area" subject to mining impacts.

Appellants insist that the evidence militated in favor of recognizing significant environmental impacts outside the area covered by the EIA. However, again, weighing the evidence that way is not this Court's, nor was it the circuit court's, task, which was and is to review for substantial evidence.

The circuit court summarized in detail the testimony of the environmental engineer who prepared Kennecott's air permit application, who stated that he intentionally overestimated the amount of air pollutants likely to be produced, but that even under those conditions the mine's emissions would fall well within

legal limits. The court additionally noted that an air quality specialist with the DEQ testified that the amount and concentration of every air pollutant or toxin that the mine would produce would be below the permitted maximum and that, even after 10 years of accumulation, the levels would be low enough that area streams and soil would meet Michigan's drinking water and direct-contact criteria. According to this expert, although particulate deposition would occur over a wide area, it would be of no consequence because even the highest of such concentrations would be at insignificant levels. The court additionally noted that two toxicologists agreed that the maximum amount of emissions and concentrations, even as projected over the 10-year expected life of the mine, did not rise to the threshold of concentrations that would bring about adverse effects in plants, invertebrates, birds, or mammals. One of them further explained that the annual maximum deposition of the two heavy metals of greatest concern, copper and nickel, would constitute a fraction of the amount of those metals that was already found in the area's soil. The other opined that the amount of heavy metals entering the area's streams would be so small that it was unlikely that there would be any toxic plume in Lake Superior or any significant effect on the mouth of the Salmon Trout River.

The circuit court further noted that several of appellants' own witnesses admitted that serious habitat fragmentation had already occurred in the area as the result of historical and ongoing logging and other activities, that there was no evidence that wildlife used the Yellow Dog Plains as a corridor between habitats, and that other areas within the vicinity of the mine provided the same habitats as those found within the mine footprint, and so wildlife displaced by the mine could readily relocate.

The court recounted that Kennecott's expert opined that the decibel level of the blasting noise would start at something akin to that of a chainsaw at the portal but only register at the level of a spoken conversation at the property line, but that after approximately one week the noise from the blasts would register at the level of a spoken conversation at the mine portal itself and would be inaudible at the fence line. The court further noted that Kennecott would be shielding lights at the mine site, building berms around the outside of the surface facilities to dampen noise, and equipping the exhaust stacks with silencers.

The court continued that Kennecott planned to build no new roads, intended to control road dust by watering at regular intervals in accordance with the strict limits set forth in the mining permit, and planned to follow a fugitive dust plan. The court further noted that there was testimony to the effect that road use associated with the mine would not have a substantial impact on wildlife in the area because the road was already well used and regularly graded.

The court additionally summarized Kennecott's blasting expert's testimony as stating that various techniques would mitigate the vibrations of blasts in order to protect sensitive areas or structures, so that the particle velocity from blasting would be well below levels that could damage buildings. The court noted that the expert added that the blasting energy would be well below the level that would be harmful to the fish in the Salmon Trout River.

Appellants do not take issue with any of these representations concerning the evidence of record, but instead point to several examples of conflicting testimony that they insist should have held sway. But the DEQ was entitled to resolve such factual controversies

on the basis of substantial evidence, and the circuit court's summary obviously showed that there was more than a scintilla of the evidence supporting the conclusion that there was no significant potential for environmental impacts beyond the immediate mining area.

### B. PLACE OF WORSHIP

Mich Admin Code, R 425.202(1)(a)(i) requires that an EIA include an "identification and description of the condition or feature as it currently exists within the mining area and the affected area." Rule 425.202(2) states that the latter requirements "apply to natural and humanmade conditions and features including, but not limited to," several listed items, among which Subrule (2)(p) specifies "[r]esidential dwellings, places of business, places of worship, schools, hospitals, government buildings, or other buildings used for human occupancy all or part of the year."

At issue is the mining project's impacts on Eagle Rock, which appellants describe in their brief on appeal as "an imposing jagged rock outcrop rising some 60 feet at its highest point, from the otherwise flat geography of the Yellow Dog Plain." The testimony below included elaborate descriptions of traditional religious and other cultural uses of that location as a special gathering place, along with ancient names for it from the pertinent Native American languages.

Kennecott's EIA considered Eagle Rock only as normal topography, its archeologist having reported nothing about that location to suggest that it was a place of any cultural significance. The Keweenaw Bay Indian Community intervened in this case over its concerns regarding the impacts of mining operations on the cultural traditions associated with Eagle Rock.

Appellees objected to further development of this issue below on the ground that appellants had stipulated to limit such advocacy to the issue of the Keweenaw Bay Indian Community's standing to intervene. The ALJ, however, reached the issue on its merits and determined that further findings were in order. The DEQ's final decision-maker, however, alternatively concluded that a stipulation kept the issue off the table and that "place of worship" for purposes of Rule 425.202(2)(p) referred to buildings for human occupancy, not purely outdoor locations. The circuit court in turn affirmed the DEQ on those alternative grounds.

We affirm on still other grounds. See *Zimmerman v Owens*, 221 Mich App 259, 264; 561 NW2d 475 (1997) (stating that this Court will not reverse when the trial court reaches the correct result even for the wrong reason). Kennecott submitted its EIA in February 2006, and public hearings on the mining application were held in September of that year. In their brief on appeal, appellants advise that Kennecott and the DEQ "were informed of the significance of Eagle Rock during the Part 632 public comment period," thus admitting that Kennecott had no knowledge of any such customs when it submitted its EIA. Appellants nowhere suggest that any investigation or inquiry on Kennecott's part in the early stages of the proceedings was deficient, nor do they cite any authority for the proposition that a mining applicant is obliged to update its EIA throughout the whole review process to take account of newly acquired information. Accordingly, assuming without deciding that no stipulation prevented litigation of this issue and also that "places of worship" for purposes of Rule 425.202(2)(p) include such outdoor locations as Eagle Rock, we nonetheless hold that Kennecott's EIA was not deficient for want of consideration of Eagle Rock as a place of worship, because it neither knew, nor should

have known, of such traditional cultural uses of that location when it offered its EIA.[7]

### C. CUMULATIVE IMPACTS ANALYSIS

Mich Admin Code, R 425.202(1)(b) requires that an EIA provided with an application for a permit to mine nonferrous metallic minerals include an "analysis of the potential cumulative impacts on each of the conditions or features listed in [Rule 425.202(2)] within the mining area and the affected area from all proposed mining activities and through all processes or mechanisms," and specifies that the analysis "consider additive effects, and the assessment of significant interactions between chemical and physical properties of any discharges, with reference to the physical and chemical characteristics of the environment into which the discharge may be released." Rule 425.202(2) lists the many features and conditions to be considered. "Cumulative impact" is "the environmental impact that results from the proposed mining activities when added to other past, present, and reasonably foreseeable future activities." Mich Admin Code, R 425.102(1)(h).

That the witnesses differed on how best to analyze cumulative impacts, and thus on whether Kennecott satisfied that requirement, is not at issue. The ALJ concluded that there was no generally accepted scientific protocol for evaluating cumulative impacts of this sort, that the only evidence in the record was that the best practice was to accumulate as much data about individual stressors as is practical and use that data to

[7] The proceedings below included occasional comments about Native American treaty rights in connection with Eagle Rock, which comments were echoed at oral argument. But such discussion was properly kept at the margins in this case, because proceedings under Part 632 are not a forum for vindicating treaty rights.

reach conclusions regarding overall potential impacts, and that because Kennecott followed that best practice its EIA included a cumulative-impacts analysis that satisfied the requirements of Part 632.

The circuit court in turn acknowledged that appellants presented witnesses who disapproved of how Kennecott endeavored to address cumulative impacts, but noted that a toxicologist had testified that the components that a cumulative impact analysis should include had in fact been addressed in Kennecott's permit application and that another expert testified that the cumulative impact of multiple stressors was very difficult to measure, that there was no established protocol for evaluating the effect of multiple stressors, at least with regard to wildlife, and that Kennecott followed the standard method of assessing cumulative impacts in its EIA.

Appellants do not dispute the circuit court's summary of the evidence but for questioning the relevance of, and otherwise discounting, the toxicologist's opinion on the sufficiency of Kennecott's approach to cumulative impacts.

We conclude that the circuit court correctly recognized that the expert testimony concerning the lack of protocols for analyzing cumulative impacts and indicating that Kennecott had followed best practices, constituted substantial evidence to support the DEQ's determination that Kennecott had satisfied the requirement to consider cumulative impacts.

VII. RECLAMATION AND ENVIRONMENTAL PROTECTION PLAN

MCL 324.63205(2)(c)(v) requires that an application for a permit to mine nonferrous metallic minerals include a reclamation and environmental protection plan, which must in turn include "[p]rovisions for the

prevention, control, and monitoring of acid-forming waste products and other waste products from the mining process so as to prevent leaching into ground-water or runoff into surface water." Mich Admin Code, R 425.203(c)(xxi) in turn requires that such plans include information depicting or describing "[p]lans and schedules for monitoring, containment, and treat-ment of surface runoff that has contacted, or may contact, ore, waste rock, overburden, or tailings deter-mined to be reactive," and that such plans "be designed to reasonably minimize actual and potential adverse impacts on groundwater and surface water by prevent-ing leaching or runoff of acid-forming waste products and other waste products from the mining process."

MCL 324.63205(2)(c)(*i*) adds that such plans must include "[a] description of materials, methods, and techniques that will be utilized." Subsection (2)(c)(*ii*) in turn calls for "[i]nformation that demonstrates that all methods, materials, and techniques proposed ... are capable of accomplishing their stated objectives in pro-tecting the environment and public health," with the exception that "such information may not be required for methods, materials, and techniques that are widely used in mining or other industries and are generally accepted as effective."

### A. ACID ROCK DRAINAGE

Appellants argue that Kennecott failed to adequately address the prevention, control, and monitoring of acid-forming waste products to prevent runoff into surface waters. The circuit court dismissed that con-cern on the ground that appellants had failed to provide evidentiary support for their position. Appellants do not argue that they did in fact provide evidentiary support for their position, but instead suggest that this issue

was self-preserving simply because, in their view, the mining application was facially deficient in addressing management of acid rock drainage and how to protect nearby watercourses from it. We disagree and conclude that the circuit court correctly recognized that appellants bore the burden of proof in the contested case proceedings (as discussed in Part IV of this opinion), and so forfeited any issue over which they failed to give expression to, and provide support for, any concerns they had.

Further, appellants argue this issue in purely substantive terms, articulating no challenge to the circuit court's decision to deem it forfeited for lack of preservation. Because appellants do not challenge the procedural basis upon which the circuit court rejected its appellate arguments regarding the adequacy of Kennecott's plans to minimize the hazards of acid rock drainage, we affirm the result below in this regard for that reason.

Alternatively, we conclude that there was substantial evidence to show that Kennecott's reclamation and environmental protection plan well enough addressed that hazard.

The evidence showed that runoff from the facility or road surfaces could contain sulfide- or sulfur-bearing rock, which could turn to sulfuric acid, and that acid rock drainage may also occur from runoff from development rock, which is the material removed from the mine to reach the ore. An environmental chemist elaborated that a project of this sort involves "a lot of rock that has not experienced oxygen or water . . . very deep in the earth," and that "as that rock is excavated . . . it is exposed to oxygen and water," triggering "reactions . . . that generate sulfuric acid." The expert added that "the sulfuric acid then dissolves a variety of

constituents," potentially resulting in "water that's . . . acidic and has a highly variable metal loading that can cause substantial impacts on receding waters."[8] The parties have consistently agreed that the hazard of acid rock drainage that this mining project poses demands careful management.

Kennecott's application reported that development rock would initially be stored in a temporary storage area, then later returned to the mine as backfill. The permit itself confirms this plan. The development rock will be sheltered and neutralized with limestone, and runoff will be routed to lined basins, whose pumps are designed to handle even severe storms, and then processed through the wastewater treatment plant. A water resources engineer testified that the life of the instant mining project was projected at seven years, but that the wastewater treatment plant was designed to accommodate extremes of rainfall that might occur over a 100-year period, and combinations of snowmelt and rainfall that might occur over a 50-year period, characterizing those models as "prudent" and resulting in a "conservative" design.

The record thus contains more than a scintilla of evidence indicating that the mining plans include adequate safeguards to protect surface waters from acid rock drainage.

### B. AIR FILTER

Appellants argued below that Kennecott had failed to provide information to show that the air filter it intended to use with its smokestack to limit emissions of pollutants would be effective for that purpose, or was

----

[8] This testimony confirms the Legislature's findings stated in MCL 324.63202(c), which we earlier set forth in the recitation of facts.

well enough established through uses in industry to obviate the need to do so. The circuit court agreed that Kennecott did not provide information regarding the exhaust stack, but rejected appellants' challenge on the basis of expert testimony that similar filtration systems were widely used in other industries and worked at a high efficiency rate.

We decline to address this issue in light of events transpiring since it was originally litigated. In their briefs on appeal, the parties agreed that Kennecott submitted an amended application for an air permit that eliminated the filter from the plan, and at oral argument the parties agreed that Kennecott prevailed in this regard and was vindicated in litigation not at issue in this appeal.

For these reasons, we decline to reach this issue in deference to an earlier determination, see *In re Application of Consumers Energy Co for Rate Increase*, 291 Mich App 106, 122; 804 NW2d 574 (2010) (noting that collateral estoppel retains limited operation in cases originating in administrative agencies), or, alternatively, because subsequent events have rendered it impossible for us to grant any relief in the matter, see *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117 (1998) ("As a general rule, an appellate court will not decide moot issues.").

VIII. CONTINGENCY PLANS

MCL 324.63205(2)(d) requires that an application for a permit to mine nonferrous metallic minerals include a "contingency plan that includes an assessment of the risk to the environment or public health and safety associated with potential significant incidents or failures and describes the operator's notification and response plans." Mich Admin Code, R 425.205(1)(a) lists

among the potential accidents or failures that must be addressed for this purpose unplanned subsidence of the mine's structure, power disruptions, equipment failures, fires, natural disasters, and the various risks attendant to producing, processing, storing, releasing, or transporting hazardous substances. Rule 425.205(1)(b) and (c) call for descriptions of emergency procedures, including persons or entities to notify, and Subrule (1)(d) calls for a plan for testing the contingency plan.

Kennecott's contingency plan listed the 12 hazards set forth in Rule 425.205(1)(a), and addressed each in turn, along with emergency procedures and testing. Appellants protest that the plan is inadequate for failure to consider interruptions of electrical service occasioned by natural disasters and for want of plans for recapturing escaping contaminants, plugging any holes or fractures associated with subsidence, neutralizing any acidification resulting from that or other mishaps, restoring water levels drawn down by subsidence, or rescuing the fish and other wildlife potentially affected by a disaster under the Salmon Trout River. Appellants further assert that the head of the DEQ's review team for this project stated that Kennecott's application "contains no contingency plan for subsidence or crown pillar failure; for closure of the wastewater treatment plant for a substantial period of time; for significantly increased inflow to the mine; malfunction of the [mine ventilation air raise] air filtering system; or for water leaking into aquifers from the underground mine." Appellants further protest that "Kennecott's application proposes to form a plan only after the fact. If its subsidence monitoring indicates the existence of a problem, only then will it initiate an evaluation of its mining methods and only then will it attempt to devise 'response measures' to combat disaster."

In contrast, the ALJ described Kennecott's contingency plan as "thorough" and "complete," addressing "a host of contingencies," including unexpected subsidence, meaning sinking, or partial collapse, of the crown pillar.

The court noted that appellants had asserted that the head of the DEQ's review team had admitted that the contingency plan failed to consider crown pillar failure, long-term closure of the wastewater treatment plant, significantly greater mining inflow than estimated, failure of the exhaust stack, contaminated-water leakage from the reflooded mine, or other catastrophic events. The circuit court continued that appellants had in fact misrepresented that DEQ official's testimony, noting that in the testimony appellants cited the official was speaking not of the contingency plan submitted by Kennecott, but of contingency conditions included within the permit.

The circuit court further noted in detail that Kennecott's plan contained information regarding each of the contingencies identified by appellants, then added that "[g]iven the multiple different variables that may come into play should any given contingency occur, such as the scope of the problem and the cause or causes of the problem, providing a range of possible measures that will be considered and undertaken is a reasonable approach to drafting a contingency plan."

Our review of the record confirms the circuit court's observations concerning the testimony of the DEQ official to whom appellants attribute admissions concerning major deficiencies in Kennecott's contingency plan. In the testimony that appellants cite, that witness was indeed testifying that the *permit*, as issued, did not address contingency plans in the event of crown pillar failure, tornadoes, forest fires, prolonged shutdowns of

the wastewater treatment plant, inflows to the mine upwards of 500 gallons per minute, or malfunctions of the air filtering system. The witness later reiterated that the permit did not include any contingency plan for failure of the crown pillar, but stated that he would have to check the application to see what it had to say on that subject, then added, "I have not agreed" that the application lacked a contingency plan for crown pillar failure. The next day, the witness again testified about hazards for which the permit, not the application, included no contingency plans. As the circuit court ably noted, the testimony cited does not support the proposition for which appellants cited it.

We further agree with the circuit court that Kennecott properly offered a range of possible responses to several potential misadventures and did not fall short in connection with the most devastating of conceivable disasters, the wholesale collapse of the crown pillar.

Kennecott's plan first describes mining techniques calculated to "minimize the potential for surface subsidence to occur," then explains the prediction that "displacement of the crown pillar . . . will be imperceptible at the ground surface," then continues as follows:

> The contingency measures to be taken in the event unanticipated surface subsidence occurs will be initiated based on subsidence monitoring. Subsidence monitoring will be performed at two locations above the ore body, adjacent to the overlying wetland. In the event of unanticipated subsidence, the mining sequence and backfill methods . . . will be evaluated and adjusted to reduce the subsidence. Adjustments to the stope sequence, backfill methods, crown pillar thickness, and backfill mix would be [made] as needed to minimize subsidence.

Appellants do not argue that adjustments in the mining sequence and backfill methods are insufficient to cor-

rect for unexpected subsidence, but instead suggest that the plan is deficient for failing to consider a disastrous degree of subsidence occurring too quickly for those techniques to remediate. We conclude that because there was substantial evidence to support the conclusion that the crown pillar would be stable (see Part V of this opinion), the DEQ and the circuit court did not err by not insisting that the contingency plan consider such an extreme-case scenario.

IX. CONCLUSION

For the reasons stated, we affirm the decision of the circuit court affirming the DEQ's decision to grant Kennecott a Part 632 mining permit.

Affirmed. No taxable costs under MCR 7.219, a question of public policy being involved.

CAVANAGH, P.J., and OWENS and STEPHENS, JJ., concurred.