*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

KIMBERLY KAMINSKY,

        Plaintiff-Appellee,

v

MATTHEW RONTAL, M.D., and WILLIAM
BEAUMONT HOSPITAL, INC.,

        Defendants-Appellants,

and

OAKLAND MEDICAL SERVICES, doing
business as THE RONTAL CLINIC,

        Defendant.

UNPUBLISHED
April 2, 2020


No. 345678
Oakland Circuit Court
LC No. 2017-157761-NH

KIMBERLY KAMINSKY,

        Plaintiff-Appellee,

v

MATTHEW RONTAL, M.D., and OAKLAND
MEDICAL SERVICES, doing business as THE
RONTAL CLINIC,

        Defendants-Appellants,

and

WILLIAM BEAUMONT HOSPITAL, INC.,

        Defendant.

No. 345706
Oakland Circuit Court
LC No. 2017-157761-NH

-1-

Before:  K. F. KELLY, P.J., and BORRELLO and SERVITTO, JJ.

PER CURIAM.

In these consolidated interlocutory appeals from a single medical malpractice action, defendants, Matthew Rontal, M.D. (Dr. Rontal), Oakland Medical Services (OMS), doing business as The Rontal Clinic, and William Beaumont Hospital, Inc. (Beaumont) (collectively, defendants), appeal by leave granted[1] an order denying their motions for summary disposition.  Defendants argue that the trial court erred by denying their dispositive motions because the opinion of plaintiff's only expert was not sufficiently reliable for admission and because plaintiff failed to establish a question of fact concerning factual causation.  For the reasons set forth in this opinion, we affirm.

## I.  BACKGROUND

On September 7, 2014, plaintiff fell from the back of a motorcycle driven by her boyfriend, Robert Gabbard.  Plaintiff fractured her mandible near the right condyle and chipped several teeth. On September 9, 2014, Dr. Rontal performed an endoscopic open reduction internal fixation of the fracture, assisted by Christopher Firlit, D.D.S.  During the procedure, Dr. Rontal placed a trapezoidal plate to reduce the fracture.  At the end of his operative note, Dr. Rontal concluded:

> Having achieved reduction, the wound was copiously irrigated and closed with 3-0 chromic.  The transbuccal incision was closed with 6-0 fast absorbing gut and Steri-Strips and Mastisol.  Occlusion[2] was checked.

> It is noted that the patient was held tightly in occlusion by the assistant while keeping the bone segments in reduction.  This was visualized endoscopically. Plating was performed while the patient was held in occlusion.

> Postoperatively, the patient had normal facial nerve function and stated that she had normal occlusion.

Dr. Firlit examined plaintiff the following morning and noted that plaintiff's occlusion appeared "stable."  Plaintiff testified that her face was very swollen during her hospitalization and that she first realized she was having problems with her bite a few days later.  Records from plaintiff's consultation with her dentist, Jeffrey C. Grabiel, D.D.S., on September 16, 2014, refer to plaintiff's

---

[1] *Kaminsky v Rontal*, unpublished order of the Court of Appeals, entered November 21, 2018 (Docket No. 345678); *Kaminsky v Rontal*, unpublished order of the Court of Appeals, entered November 21, 2018 (Docket No. 345706).

[2] Occlusion refers to "the bringing of the opposing surfaces of the teeth of the two jaws into contact; *also* : the relation between the surfaces when in contact[.]"  Merriam-Webster's Collegiate Dictionary (11th ed).

"open bite" on the right side of her jaw, as do Dr. Rontal's records from plaintiff's first postoperative follow-up visit on September 18, 2014.

Plaintiff filed a complaint against defendants alleging that Dr. Rontal breached the standard of care during the surgical repair of her mandibular fracture, leaving plaintiff with "a dysfunctional jaw, degenerative changes in her temporomandibular (TM) joints, an open bite, and heavy contact in the right occlusion."[3] Plaintiff's expert, William Clark, M.D., opined that the only manner in which Dr. Rontal breached the standard of care was by mistakenly concluding that plaintiff was in good occlusion when he affixed the plate to her jaw. Beaumont moved for summary disposition under MCR 2.116(C)(10), arguing that Dr. Clark's opinion was unreliable and inadmissible because it was based on assumptions that were contrary to the firsthand observations documented in plaintiff's medical records. OMS also moved for summary disposition, asserting that plaintiff could not demonstrate that her injuries were caused by Dr. Rontal's treatment, as opposed to the negligence and reckless driving of Gabbard, the original tortfeasor. The trial court denied both dispositive motions, and these appeals followed.

## II. STANDARD OF REVIEW

This Court reviews rulings on summary disposition motions de novo. *Jones v Botsford Continuing Care Corp*, 310 Mich App 192, 199; 871 NW2d 15 (2015). Under MCR 2.116(C)(10), the trial court should grant summary disposition "if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Dancey v Travelers Prop Cas Co*, 288 Mich App 1, 7; 792 NW2d 372 (2010) (quotation marks and citation omitted). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "When deciding a motion for summary disposition under this rule, a court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence then filed in the action or submitted by the parties in the light most favorable to the nonmoving party." *Bialick v Megan Mary, Inc*, 286 Mich App 359, 362; 780 NW2d 599 (2009).

## III. BREACH OF THE STANDARD OF CARE

Defendants argue on appeal that they were entitled to summary disposition because Dr. Clark's expert testimony regarding Dr. Rontal's alleged breach of the standard of care was inadmissible.

It is well-settled that a plaintiff who brings a cause of action for medical malpractice bears the burden of establishing four elements:

(1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the

---

[3] Plaintiff's claims against OMS and Beaumont are based on vicarious liability for Dr. Rontal's negligence.

proximate result of the defendant's breach of the applicable standard of care.
[*Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004).]

"Expert testimony is required to establish the applicable standard of care and to demonstrate that the defendant breached that standard." *Gonzalez v St John Hosp & Med Ctr (On Reconsideration)*, 275 Mich App 290, 294; 739 NW2d 392 (2007). Under MRE 702, a qualified expert witness may testify in the form of an opinion if "(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

In support of their first claim of error, defendants rely primarily on this Court's decision in *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278; 602 NW2d 854 (1999). The plaintiff in *Badalamenti* alleged that the defendant negligently failed to diagnose and properly treat the plaintiff's cardiogenic shock, while the defendant asserted that the plaintiff did not suffer from cardiogenic shock, but rather, a severe adverse reaction to a medication administered in the emergency department. *Id*. at 281-282. The plaintiff's expert testified that three definitive hemodynamic measurements were required to diagnose cardiogenic shock and that cardiogenic shock involves "*significant* damage to the heart's pumping action." *Id*. at 286-287. The expert acknowledged that the plaintiff's objective hemodynamic measurements did not support a finding of cardiogenic shock, but continued to opine that the plaintiff suffered from cardiogenic shock based upon his skepticism of an echocardiogram performed by another physician during the plaintiff's treatment. *Id*. That physician testified that he observed the pumping function of the plaintiff's heart while the echocardiogram was in progress and determined that the plaintiff's ventricular function was essentially normal, which would rule out a diagnosis of cardiogenic shock. *Id*. at 287-288.

This Court held that the opinion offered by the plaintiff's expert regarding the plaintiff's alleged cardiogenic shock was not supported by legally sufficient evidence. *Id*. at 288-289. As this Court explained, "an expert's opinion is objectionable where it is based on assumptions that are not in accord with the established facts." *Id*. at 286. "This is true where an expert witness' testimony is inconsistent with the testimony of a witness who personally observed an event in question, and the expert is unable to reconcile his inconsistent testimony other than by disparaging the witness' power of observation." *Id*. The plaintiff's expert conceded that "on the basis of the information in the record, a competent cardiologist might logically conclude that plaintiff did not have cardiogenic shock," and that an adverse reaction to the medication administered by the emergency department could not be ruled out. *Id*. at 289. Because the plaintiff's expert relied only on his disparagement of findings reached by the physician who performed the plaintiff's echocardiogram, this Court determined that the expert's opinion was not sufficient to establish that the plaintiff actually suffered from cardiogenic shock, which was essential to the plaintiff's cause of action. *Id*.

Defendants argue that this case is analogous to *Badalamenti* because Dr. Clark's opinion was based on a belief that was contrary to facts established in plaintiff's medical records. Dr. Clark opined that Dr. Rontal breached the standard of care by failing to ensure that plaintiff was in proper occlusion before affixing the plate to plaintiff's mandible. But according to defendants, Dr. Clark's opinion was improper under *Badalamenti* because it was contrary to Dr. Rontal's operative note indicating that plaintiff was in good occlusion during and after the surgery, as well

as Dr. Firlit's finding that plaintiff's occlusion was stable when she was examined the following day.

This Court recently analyzed *Badalamenti*, acknowledging the "fact-driven" nature of its ruling in that case. *Taylor Estate v Univ Physician Group*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket No. 338801); slip op at 7; lv pending. In *Taylor Estate*, the plaintiff's decedent died from a fatal hemorrhage days after the defendant biopsied what he believed to be arteriovenous malformations (AVMs) while performing a colonoscopy. *Id*. at ___; slip op at 1-2. The defense expert, Dr. Veslav Stecevic, performed an emergent colonoscopy on the decedent when she returned to the hospital and observed that the bleeding originated from a ruptured diverticulum, which Dr. Stecevic characterized as "wholly incidental" to the biopsies and a " 'random' event." *Id*. at ___; slip op at 2. Dr. Stecevic also saw no evidence of an AVM during the emergent colonoscopy and, therefore, opined that the defendant did not actually biopsy an AVM. *Id*. The plaintiff's expert, Dr. Todd Eisner, testified that the defendant's AVM biopsies caused the fatal bleeding and provided several reasons for disbelieving Dr. Stecevic's observation that the bleeding "came from a spontaneously ruptured diverticulum rather than a recently biopsied AVM." *Id*. at ___; slip op at 3. For instance, when a large amount of blood collects in the colon, the blood can spill into, and then out of, the diverticular pockets, making it look as though the diverticula are bleeding. *Id*. In addition, Dr. Stecevic indicated that he controlled the diverticular bleed with a shot of epinephrine, yet the decedent's colon continued to bleed, eventually requiring the complete removal of the decedent's colon. *Id*.

Distinguishing *Badalamenti*, the *Taylor Estate* Court reasoned:

[In *Badalamenti*], evidence of causation rested largely on objective measurements obtained by machines rather than eyewitness observations. The subjective component of the evidence—a physician's interpretation of the echocardiogram results—did involve a treating cardiologist's impression of what he saw. But [the plaintiff's expert] agreed that the echocardiogram did not reflect "definite evidence of major damage to plaintiff's heart wall," and supported that the plaintiff's left ventricular systolic function "was fairly well-preserved." Despite these concessions, [the expert] insisted that the plaintiff had cardiogenic shock, a conclusion he reached by disparaging the cardiologist's interpretation of the echocardiogram. [The expert] offered no explanation for how or why the cardiologist might have misinterpreted the echocardiogram. Instead, [the expert] simply stated that the cardiologist who performed the echocardiogram was wrong about the ultimate conclusion.

Unlike the hemodynamic measurements that figured prominently in *Badalamenti*, the evidence supporting that [the decedent's] bleed came from a diverticulum rather than a biopsied AVM is purely subjective—Dr. Stecevic's interpretation of what he saw. The physician who performed the biopsy—an eyewitness to that procedure—documented in the medical record and testified that he biopsied an AVM. This evidence supplied the facts underpinning Dr. Eisner's testimony. Were we to apply *Badalamenti* in the manner urged by defendants, we might question whether Dr. Stecevic should be permitted to testify that [the defendant] did not biopsy an AVM, as Dr. Stecevic's testimony contradicts that of

an eyewitness to the procedure—[the defendant]. But doing so would be error for the same reason that disallowing Dr. Eisner's opinion is improper. Unlike in *Badalamenti*, the experts in this case have formed their opinions based on facts of record, and have drawn reasonable inferences from the evidence. Their opinions are consistent with the facts and the inferences, and are not grounded in mere speculation or baseless disdain for a contrary conclusion. [*Id*. at ___; slip op at 7-8 (citation and footnote omitted).]

After emphasizing that both experts' opinions rested on subjective perceptions that were subject to credibility challenges, *id*. at ___; slip op at 8-9, the *Taylor Estate* majority further distinguished *Badalamenti* on the basis that Dr. Eisner articulated a reasonable basis for questioning the accuracy of Dr. Stecevic's perception and presented a logical causation theory supported by facts of record, *id*. at ___; slip op at 10.

Here, Dr. Clark testified that the standard of care required Dr. Rontal to ensure that plaintiff was in good occlusion when he affixed the plate to plaintiff's mandible. Although Dr. Rontal documented that plaintiff "was held tightly in occlusion by the assistant" while the plating was performed, which Dr. Rontal "visualized endoscopically," Dr. Clark disagreed that plaintiff's occlusion was properly aligned. Dr. Clark's deposition was the only expert testimony before the trial court when it decided defendants' dispositive motions, and Dr. Clark indicated that determining whether a patient is in good occlusion is principally a visual determination. Thus, like the subjective perceptions at issue in *Taylor Estate*, the findings by Dr. Rontal and Dr. Firlit were subject to credibility challenges because their findings involved their own interpretations of what they had seen.

Additionally, we reject defendant's assertion that *Badalamenti* somehow transfers medical reports into sacrosanct documents. Following defendants' arguments to its logical conclusion, a medical provider could simply write: "Thankfully, no malpractice occurred in any of the procedures performed," which would immunize a medical provider from contrary expert opinions.

Also, contrary to defendants' assertions, Dr. Clark did not rely exclusively on the fact that plaintiff eventually developed malocclusion to reach his opinion. As mentioned at oral argument, and viewing Dr. Clark's testimony in the light most favorable to plaintiff, it appears that Dr. Clark also relied upon the timing and degree of plaintiff's malocclusion, both of which were objective matters that were supported by record evidence. Although there is no indication of malocclusion in the hospital records, plaintiff's dentist noted that plaintiff had an open bite just one week after the surgery.[4] When plaintiff followed up with Dr. Rontal days later, she complained that her teeth were unable to come together on the right side, and Dr. Rontal noted in his records that "[n]ot all posterior teeth meet on the right side." According to Dr. Clark, although a traumatic injury can cause degenerative joint disease like plaintiff had experienced, it would not cause malocclusion in such a short time span. Furthermore, while Dr. Clark agreed that a patient might experience a small degree of malocclusion even when the surgical repair is properly performed, he concluded

---

[4] Although Dr. Grabiel's handwritten records refer to the open bite as having been caused by plaintiff's initial trauma, it is unclear whether Dr. Grabiel was referring to his professional opinion regarding the cause of plaintiff's open bite or merely reiterating what plaintiff reported to him.

that gross malocclusion of the magnitude plaintiff experienced would not occur unless the patient was not in good occlusion during the procedure, the hardware failed, or subsequent trauma occurred. Because there is no evidence that the plating failed or that plaintiff injured her jaw again after the surgery, a factfinder could reasonably infer that plaintiff's mandible was not in a position of proper occlusion during the surgery.

Dr. Clark explained why he questioned the subjective findings regarding plaintiff's occlusion during the surgery. According to Dr. Clark, it would be very difficult for Dr. Firlit to hold plaintiff in good occlusion while Dr. Rontal was affixing the plate to plaintiff's mandible. Furthermore, the medical records indicated that Dr. Rontal checked plaintiff's occlusion endoscopically, but Dr. Clark opined that a surgeon could not reliably use an endoscope to determine occlusion. Dr. Clark explained that an endoscope only shows the surgeon a small area, so it would be necessary to move the endoscope from one side of the patient's teeth to the other to fully view the patient's occlusion. Thus, even if the patient was in good occlusion in each particular area as that area was visualized through the endoscope, the patient's teeth could shift before the final process of the plating was completed. In sum, because the "facts" that Dr. Clark disagreed with were subjective perceptions of plaintiff's treating physicians and Dr. Clark provided a sound basis for disagreeing with those perceptions, the trial court did not err by finding that plaintiff established a question of fact as to whether Dr. Rontal breached the standard of care by failing to ensure that plaintiff was in proper occlusion during the surgery. *Id*. at ___; slip op at 6-10.

We stress that our role at this juncture relative to this issue is simply to decide whether the trial court erred when deciding that plaintiff's expert testimony was admissible. The trial court correctly understood that the weight and credibility of the expert's opinions should be left to the trier of fact, and from our review of the record we find no error in the trial court's ruling. Accordingly, defendants are not entitled to relief on this issue.

Defendants also challenge the admissibility of Dr. Clark's testimony under MCL 600.2955, which sets forth several factors a trial court should consider to determine whether an expert's opinion is sufficiently reliable. *Elher v Misra*, 499 Mich 11, 23; 878 NW2d 790 (2016). Although Beaumont cited MCL 600.2955 in its motion for summary disposition, its only substantive challenge of Dr. Clark's opinion was premised on Dr. Clark's contradiction of facts contained in plaintiff's medical records. As such, this issue is not properly preserved for review, *King v Oakland Co Prosecutor*, 303 Mich App 222, 239; 842 NW2d 403 (2013), and our review is limited to plain error affecting substantial rights, *Nat'l Wildlife Federation v Dep't of Environmental Quality*, 306 Mich App 369, 373; 856 NW2d 394 (2014). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Bennett v Russell*, 322 Mich App 638, 643; 913 NW2d 364 (2018) (quotation marks and citation omitted). An error affects substantial rights if it caused prejudice by affecting the outcome of the proceedings. *Lawrence v Mich Unemployment Ins Agency*, 320 Mich App 422, 443; 906 NW2d 482 (2017).

A party that moves for summary disposition under MCR 2.116(C)(10) must " 'specifically identify the issues as to which the moving party believe there is no genuine issue as to any material fact.' " *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 369; 775 NW2d 618 (2009), quoting MCR 2.116(G)(4). "The level of specificity required under MCR

2.116(G)(4) is that which would place the nonmoving party on notice of the need to respond . . . ." *Barnard Mfg Co*, 285 Mich App at 369. "If the moving party fails to properly support its motion for summary disposition, the nonmoving party has no duty to respond and the trial court should deny the motion." *Id*. at 370. As previously noted, Beaumont referred to MCL 600.2955 in its dispositive motion, but did not present any substantive argument concerning the requirements of the statute. Instead, Beaumont limited its argument to Dr. Clark's disagreement with facts set forth in the medical records. Beaumont's cursory reference to MCL 600.2955 did not satisfy the requirement in MCR 2.116(G)(4) that the moving part specifically identify the issues as to which it believes there is no genuine issue of material fact. As such, the trial court did not plainly err by denying Beaumont's motion for summary disposition.

## IV. CAUSATION[5]

Defendants also argue that they were entitled to summary disposition because plaintiff failed to establish a question of fact as to whether Dr. Rontal's treatment was a "but for" cause of plaintiff's injuries.

In order to establish the causation element of a medical malpractice case, the plaintiff must demonstrate that the defendant's negligence was both a factual and legal cause of the plaintiff's injuries. *Craig*, 471 Mich at 86-87. "While legal causation relates to the foreseeability of the consequences of the defendant's conduct, the cause-in-fact prong generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred." *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 496; 791 NW2d 853 (2010) (quotation marks and citation omitted). "Cause in fact may be established by circumstantial evidence, but such proof must be subject to reasonable inferences, not mere speculation." *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 496; 668 NW2d 402 (2003). As with other causes of action sounding in negligence, there may be more than one proximate cause of a plaintiff's injuries, and the plaintiff need only establish that the defendant's actions were *a* proximate cause. *Id*. at 497.

Defendants argue that plaintiff failed to demonstrate that her malocclusion was more probably than not caused by Dr. Rontal's negligence, as opposed to the traumatic injury she sustained when she fell from Gabbard's motorcycle. Viewing the record in the light most favorable to plaintiff, we conclude that plaintiff produced sufficient evidence to create a question of fact regarding this issue. As defendants note on appeal, plaintiff's description of the sequelae of her fractured jaw in the lawsuit she filed against Gabbard and Allstate Property and Casualty Company

---

[5] We acknowledge that this issue is not properly before us in Docket No. 345678 because Beaumont did not raise it in its application for leave to appeal. See *Kaminsky v Rontal*, unpublished order of the Court of Appeals, entered November 21, 2018 (Docket No. 345678) (granting leave to appeal, limited to issues raised in application). However, Dr. Rontal is a named appellant in both consolidated appeals, and a challenge regarding factual causation was properly raised in the application for leave to appeal in Docket No. 345706. Because each defendant's potential liability turns on the alleged negligence of Dr. Rontal, this Court's resolution of this issue with respect to Dr. Rontal and OMS will necessarily affect Beaumont's vicarious liability.

was extremely similar to the damages she claims in this case.[6]   However, the specific injuries involved in each case are distinct.  In plaintiff's earlier case, she sought damages arising from Gabbard's negligent driving, including compensation for having fractured her jaw.  In this case, plaintiff seeks damages for the degenerative changes in her TM joints, open bite, and malocclusion on her right side allegedly caused by Dr. Rontal's malpractice.  While plaintiff's injuries are undoubtedly related, they are the result of two separate events.  See *Beebe v Hartman*, 290 Mich App 512, 521-522; 807 NW2d 333 (2010), vacated in part on other grounds 489 Mich 956 (2011) (distinguishing leg fractures sustained in snowmobile accident from pain and contracture of the toes caused by physician's failure to diagnose compartment syndrome while treating fractures).

Moreover, defendant's contention that there was no evidence to demonstrate that the malocclusion and degenerative changes in plaintiff's jaw would not have occurred but for Dr. Rontal's negligence ignores much of the evidence described in Part III of this opinion.  Defendants focus on Dr. Clark's agreement that a small degree of malocclusion can occur even when the surgeon complies with the standard of care, but completely disregard Dr. Clark's further explanation that gross malocclusion of the magnitude plaintiff experienced would not occur unless the patient was not in good occlusion during the procedure, the hardware failed, or subsequent trauma occurred.  As previously noted, because there was no evidence that the hardware used by Dr. Rontal failed or that plaintiff suffered a new traumatic injury after the surgery, a factfinder could reasonably infer that plaintiff's malocclusion and joint degeneration was caused by Dr. Rontal's failure to ensure that plaintiff was in good occlusion during the surgery.  Dr. Clark's opinion was not strictly a matter of conjecture because it was based on how swiftly plaintiff's malocclusion manifested and the severity of plaintiff's condition.  Furthermore, even though Dr. Clark acknowledged that a traumatic injury to the jaw *could* cause some degree of malocclusion regardless of negligence on the part of the treating physician, he explicitly testified that a properly treated patient would have a low probability of future problems.  Again, we note our responsibility at this juncture is to adjudicate whether the trial court properly found sufficient evidence and questions of fact to be decided by the trier of fact.  Viewed in the light most favorable to plaintiff, reasonable minds could differ as to whether Dr. Rontal's treatment was a cause in fact of plaintiff's injuries.  As such, the trial court did not err by denying OMS's motion for summary disposition.

Affirmed.  No costs are awarded.  MCR 7.219.

/s/ Stephen L. Borrello
/s/ Deborah A. Servitto

---

[6] In both cases, plaintiff alleged the she injured her jaw, which resulted in constant pain on the right side of her face, a speech impairment, cosmetic changes to her smile, misalignment of her teeth, difficulty chewing, and an inability to perform oral sex.